The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act and the employer-employee relationship existed on May 17, 1988, which is the date of the injury giving rise to this claim.
2. Hanover Insurance Company was the carrier on the risk.
3. The fifteen page recorded statement of the plaintiff taken on June 27, 1988 was stipulated into evidence, and marked as Defendants' Exhibit 2, and is incorporated herein.
* * * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, and some modification to Findings of Fact # 11, 14 and 15, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. On May 17, 1988, the plaintiff was a 37 year old female who had completed her G.E.D., was 5 feet, 4 inches tall, and weighed 207 pounds. She had been employed full time since October of 1986 as the office manager and shipping and receiving clerk for defendant's warehouse and assembly operation in Gastonia, North Carolina.
2. The defendant-employer was a warehouse for refrigeration and air conditioner valves and parts which are assembled, if necessary. The warehouse had two full-time employees, the plaintiff and David Mitchell.
3. The plaintiff's average weekly wage was $290.00, which yields a weekly compensation rate of $193.34.
4. On May 17, 1988, the plaintiff arrived at the warehouse at approximately 7:30 a.m. She unlocked the building and went into the office. Upon opening the door, she noticed an odor which was metallic in nature. She proceeded to turn on the lights and begin her work. She noticed a metal taste in her mouth, with her eyes watering, and with her nose burning. Within 20 minutes, the plaintiff began to experience a headache.
5. On the previous day, the defendant had experienced an alkali chemical leak. Therefore, the plaintiff proceeded to the warehouse area. She observed a blue haze in the warehouse and offices. In walking through the warehouse, the plaintiff found a 55 gallon plastic barrel containing nitric acid which was leaking.
6. The plaintiff opened exterior doors and turned on 2 exhaust fans. She left the building and purchased 2 respirators and chemicals to clean up the spill.
7. David Mitchell reported to work at 7:50 a.m. on May 17, 1988, and he did not see a blue haze in the air. He did detect a slight odor, but experienced no symptoms as a result of his work in the warehouse. Mr. Mitchell did not wear a respirator, and he did use a forklift to move the barrel outside onto the loading dock.
8. The plaintiff continued to work throughout the day, wearing the respirator until approximately 10:00 or 11:00 a.m., when she no longer saw the blue-white haze. The plaintiff could not smell the chemical odor with the respirator in use.
9. On the morning of May 18, 1988, at approximately 2:00 a.m., the plaintiff began to experience pain in her chest for which she sought treatment at Lincoln Memorial Hospital. After undergoing a chest x-ray and other testing, the plaintiff was diagnosed as having acute bronchitis and was given medication. After the medication did not help, the plaintiff sought further medical care from Gaston Memorial Hospital.
10. The plaintiff did not miss any time from work as a result of the chemical exposure.
11. While the plaintiff denied any prior respiratory problems, including coughs and wheezes, and she related this history to Dr. John Kreit, Dr. Jay Hendler, Dr. Peter Loper, Dr. Brian Boehlecke and Dr. William B. Wood, she admitted on cross-examination that she had been prescribed Vanceril inhalant in June of 1987. However, she indicated this was prescribed after an incident of breathing paint stripper at work. The explanation is not accepted as credible or convincing, as Dr. Loper has opined that Vanceril is an inhaled steroid, anti-inflammatory drug used as a first line drug for asthma. He has further stated that he does not use this drug for any other purpose. Medical history noted reports of smoking 3 packs of cigarettes per day.
11. The plaintiff admitted to having smoked at least one pack of cigarettes per day since age 11. On June 27, 1988, she indicated in the recorded interview that she was down to 6 cigarettes per day. However, Dr. Jay Hendler related that up to the last visit in June of 1992, he had advised the plaintiff to lose weight and quit smoking.
12. The plaintiff sought treatment from pulmonologist Dr. John Kreit from July 1988 until 1991. The plaintiff initially complained of dyspnea, cough non-productive of sputum, and substernal chest discomfort. Dr. Kreit ordered a pulmonary function test and exercise study, both of which were reported as essentially normal, with a mild restrictive pulmonary disease. From 1991 until June of 1992, Dr. Jay Hendler assumed plaintiff's care after Dr. Kreit left his practice.
13. From 1988 through 1992, the plaintiff underwent 13 pulmonary studies, in an attempt to determine the nature of her respiratory complaints.
14. Dr. Hendler has opined that plaintiff's weight, which was up to 247 pounds at the highest during his treatment of her restrictive disease, was most probably the cause of plaintiff's restrictive disease He has further stated that he has never seen nitrogen dioxide cause restrictive pulmonary disease, and further that it would be unusual for smoking to be the cause of plaintiff's restrictive pulmonary disease.
15. The plaintiff testified that she had difficulty breathing, wheezed and coughed often, and sometimes had problems speaking. However, at the hearing, the Deputy Commissioner observed that plaintiff testified for two hours and nineteen minutes and did not cough or wheeze. The Deputy further observed that plaintiff spoke in a loud, even toned voice the entire time, and exhibited no difficulty breathing.
16. The plaintiff was referred to Dr. Boehlecke and Dr. Wood in Chapel Hill, where she underwent an open lung biopsy. Following the results of the biopsy and other testing, Dr. Hendler opined that based on the objective data, he could not say the exposure caused a restrictive/interstital pulmonary disease.
17. In an August 11, 1989 note, Dr. Boehlecke opined that plaintiff had a chronic bronchitis which was initiated by her acute exposure at work. Dr. Boehlecke further stated that he did not understand the restrictive impairment but wondered about the contribution of her chest wall discomfort with her obesity and that he thought she may have some psychogenic component as well.
18. The plaintiff was referred by defendants to Dr. Peter Loper, a pulmonologist, where on April 6, 1993 an examination disclosed a heavy (thick-walled) chest with diminished diaphragmatic excursion. All pulmonary tests were evaluated and Dr. Loper opined that he likewise could not relate plaintiff's complaints to the exposure on May 17, 1988.
19. Nitric acid produces a sweet smelling reddish-brown vapor.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. The plaintiff sustained an injury by accident arising out of and in the course of her employment on May 17, 1988, when she was exposed to a chemical leak in the warehouse. As a result of this exposure, the plaintiff did not miss any work. Therefore, she is not entitled to any temporary total disability compensation.
2. In order for the complaints plaintiff raised at the hearing to be compensable, the plaintiff must prove that the condition complained of was causally related to the accident on May 17, 1988. There must be competent, credible, and convincing evidence to support the inference that the accident in question resulted in the injury of which plaintiff complains. Click v.Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389
(1980). No doctor providing treatment or evaluation of the plaintiff has offered the necessary convincing connection between the plaintiff's chemical exposure and restrictive impairment. To the contrary, Dr. Hendler and Dr. Loper have opined that plaintiff's weight was the likely cause of her chest pain, and other testing has been reported essentially as normal. Dr. Boehlecke has further opined that even after an open lung biopsy, the plaintiff's lungs are normal, and he suggests a psychogenic cause for plaintiff's symptoms.
3. The plaintiff has failed to sufficiently, credibly, or convincingly carry the burden of proof that her inability to work and any current respiratory problems and resulting medical treatments are related to the chemical exposure of May 17, 1988.
* * * * * * * * * * *
Based upon these conclusions of law, the Full Commission have determined there exists no basis for amending the Award. Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
ORDER
1. Plaintiff's claim for further benefits under the law must be DENIED.
2. Each side shall pay its own costs.
IT IS FURTHER ORDERED that this case be removed from the Full Commission docket.
This the __________ day of ________________________, 1995.
 S/ _____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _____________ J. RANDOLPH WARD COMMISSIONER
DISSENTING — SEE ATTACHED
S/ _____________ COY M. VANCE COMMISSIONER
JHB/nwm